## No. 8544.

CONSUMERS' LEAGUE OF COLORADO *v.* COLORADO & SOUTHERN RAILWAY COMPANY ET AL.

1. PUBLIC UTILITIES COMMISSION—*Powers.* The Commission has no power to prescribe a charge for a service not to be rendered. It has nothing to do with commercial problems and policies.

2. —— *Railway—Switching Charges.* A rule eliminating all distinctions between shipments over the line of the carrier, and switching charges, prescribing a uniform rate for all cases, regardless of whether switching is performed or not, condemned.

*Writ of Review to the Public Utilities Commission.*

Mr. CARL WHITEHEAD, Mr. ALBERT L. VOGL, for complainant and plaintiff in error.

Mr. C. C. DORSEY, for Union Pacific R. R. Co.

Mr. E. E. WHITTED, for Colorado & Southern Railway Co. and Chicago, Burlington & Quincy Railroad Co.

Mr. E. N. CLARK, for the D. & R. G. R. R. Co.

Mr. Justice Scott delivered the opinion of the court:

There were two petitions filed by the complainant with The Public Utilities Commission of the state against the respondents, railroads. Both were heard together and are here presented on the same record for review.

It was alleged in the first petition:

"That defendants are, and each of them is a common carrier; that defendants, The Colorado & Southern Railway Company, Chicago, Burlington & Quincy Railroad Company, and Union Pacific Railroad Company, are common carriers engaged in the transportation of lignite coal from the coal field located in Boulder and Weld Counties, Colorado (being the coal fields generally known as and hereinafter referred to as the "Northern Fields") to Denver; that each of the defendants operate railway terminals in the City and County of Denver, and each of said defendants transports and delivers lignite coal from said Northern field over and upon the said terminals operated respectively

by it; that as such common carriers, and in respect to such traffic, defendants are, and each of them is, subject to the provisions of chapter 5 of the Session Laws of Colorado for 1910.

Third: That defendants, The Colorado & Southern Railway Company, Chicago, Burlington & Quincy Railroad Company, and Union Pacific Railroad Company, have each recently published tariffs effective July 1st, 1914, said tariffs being respectively numbered Supplement No. 11 to C. R. C. No. 261, Supplement No. 29 to C. R. C. No. 33, and tariff C. R. C. No. 51. That in and by said tariffs each of said defendants have published and established rates of 75, 70 and 60 cents per ton for the transportation of lump, mine run and slack lignite coal, respectively, in car load lots, from said Northern fields to Denver, including delivery upon the Denver terminals of any of the defendants other than the defendant upon whose line the traffic originated."

It was then alleged that the said rates of 75, 70 and 60 cents for such transportation are unjust, unreasonable and excessive, and subject the citizens and consumers of the City of Denver, and the traffic of said Northern field to undue and unreasonable prejudice and disadvantage, and is in violation of sections 3 and 5 of chapter 5 of the Session Laws of 1910, and that a just and reasonable rate, including a delivery to one or the other of the respondents, upon the interchange track with such respondents, would be 40 cents per ton in car load lots. That the respondent, the Colorado & Southern Railway Company, is, and for several years last past has been, transporting all grades of lignite coal in car load lots from the mines in said Northern fields, located upon its line, and delivering the same to the interchange track between it and the Rock Island road for 40 cents per ton.

It is further alleged that a maximum rate of $3.00 per car is a reasonable, just and compensatory rate for respondents, and each of them, to charge for switching service involved in delivering a car load of said lignite coal to any public track, spur, private siding, or industry track upon

its terminal, after such car has been delivered to it by one of the other respondents.

The second petition alleged:

"Third: That all of the defendants herein were parties to two certain proceedings before this Commission, being cases numbered 22 and 34 by this Commission, and generally known as The Consumers' League and the Garwood cases, respectively. That in each of said cases this Commission was petitioned to determine what would constitute reasonable rates for the transportation described in paragraph 'second' hereof, and in each of said cases determined that 55, 50 and 45 cents per ton upon lump, mine run and slack coal, respectively, would constitute reasonable rates for transportation of lignite coal from the Northern Colorado coal fields aforesaid to Denver; that the decision of this Commission in the Consumers' League case has been expressly approved and affirmed by the District Court of the City and County of Denver, and no ruling has ever been made by any court adverse to the decision of this Commission in the Garwood case.

Fourth: That in defiance of the aforesaid decisions of this Commission, and of the aforesaid decision of the District Court of the City and County of Denver in The Consumers' League case, defendants, acting through their respective attorneys and traffic officials, have entered into a conspiracy to disregard and defy said decisions, and to disregard and violate the provisions of said chapter 5 of the Session Laws of Colorado for 1910, and as a part of and in pursuance of said conspiracy, defendants, The Colorado & Southern Railway Company, published and issued its tariff Supplement No. 11 to C. R. C. No. 261, and defendant, the Chicago, Burlington & Quincy Railroad Company, issued its tariff Supplement No. 29 to C. R. C. No. 33, and defendant, the Union Pacific Railroad Company, issued its tariff C. R. C. No. 51, all of said tariffs being made effective July 1st, 1914; that each defendant in its aforesaid tariff published rates of 55, 50 and 45 cents per ton for the transportation of lump, mine run and slack lignite coal, re-

spectively, in car load lots, from the mines in said Northern Colorado coal fields to Denver, when billed direct from said mines for delivery at the public team tracks in Denver of the defendant upon whose lines the coal originated, and when so delivered, and in and by said tariffs defendants, and each of them, have published rates of 75, 70 and 60 cents per ton on lump, mine run and slack coal, respectively, in car load lots, when transported from said mines in said Northern Colorado coal fields and delivered in Denver upon the spurs, private sidings and industry tracks of the carrier upon whose line the coal originated; that defendant, the Union Pacific Railroad Company, in its tariff aforesaid, in order to deceive and mislead the public, and to conceal its part in the conspiracy aforesaid, and in an attempt to discredit this Commission, has caused to be prominently printed upon its tariff the statement, 'Rates named herein to Denver and Greeley are established in compliance with orders of the State Railroad Commission of Colorado;' that in so far as said statement refers to the 75, 70 and 60-cent rates aforesaid, complainant alleges such statement is wantonly and maliciously misleading, as this Commission has never ordered or approved said rates in any proceeding whatsoever.

Fifth: Petitioner alleges that the aforesaid rates of 75, 70 and 60 cents per ton, respectively, on lump, mine run and slack lignite coal, in car load lots, for the transportation thereof from said Northern Colorado coal fields to Denver, including delivery upon a spur, private siding or industry track of the carrier upon whose line the traffic originated, are, and each of them is, unjust, unreasonable and excessive, and in violation of the provisions of section 3 of the aforesaid chapter 5 of the Session Laws of Colorado for 1910."

There are other allegations, but the foregoing involves all that is necessary to consider.

The Public Utility Commission, in its findings, recites that in a former proceeding between the same parties, and involving the same questions under the Railroad Commis-

sion Act of 1910, the District Court of the City and County of Denver, upon an appeal from the order and findings of the Railroad Commission, and on the 2nd day of May, 1914, sustained the Commission in fixing the rates from the Northern coal field to any point on the line of the carrier on which the shipment originated, at 55, 50 and 45 cents, respectively, for lump coal, mine run and slack, and held such rates to be reasonable, but held that switching charges were a separate and distinct charge, not involved in the rate fixed. That switching was a different service, for which a separate but reasonable charge must be made.

Afterward the respondents filed their schedule of rates, which include, without distinction, and as a whole, switching charges in all cases, whether such services were rendered or not. It is this schedule of rates of which complaint is made, and which were sustained by the Commission in this case, and now before us for review.

It is clear from the findings of the Commission that the rule adopted, eliminating all distinction as between shipments on the line of the carrier, and switching charges, and making a uniform rate in all cases, regardless of whether or not a switching service was rendered, was based upon the notion of the Commission as to commercial considerations, and not upon transportation considerations, with which alone the Commission has the power to deal. This holding is without legal precedent and has been uniformly held to be invalid.

Judge Perry, in a very carefully considered opinion in the case when before him, has clearly and aptly stated the law on the subject as follows:

"Every charge for transportation comprehends compensation for initial terminal services, for haulage services and for final terminal services. In fixing a rate, all incidental terminal services, that is to say all terminal services which appertain to the traffic as a whole, must be considered, and the rate must include and must be understood to include these incidental terminal services. In fixing a rate, neither the carrier nor the Commission has the right to consider

any extra terminal services, that is to say terminal services which do not appertain to the traffic as a whole, but which are to be rendered in connection with certain parts of the traffic only, and as occasion may from time to time require. Neither the carrier nor the Commission may fix a rate which will include these extra terminal services. A rate fixed either by the carrier or Commission is understood to mean simply for the haulage services, including the incidental and excluding the extra terminal services.

The carriers were under no obligation to deliver this coal except on their own tracks, respectively. If the coal, after reaching Denver, had to be transferred to the track of a second carrier, the shipper or consignee could be obliged to pay for this transfer, either directly to the second carrier, or to reimburse the first carrier for making or pay for the transfer; or, in railroad parlance, 'for absorbing the switching.'

In fixing the rates in this case, the Commission simply determined what would be a reasonable charge for the line haul, including, of course, charges for incidental terminal services, and there is nothing in the order set out in paragraph 3, *supra,* nor in the law, which prevented the carriers from making special charges for storage, reconsignments, absorbing switching and other extra terminal services, and that the carriers understood that this is the meaning of the statute and that there was nothing in the order of the Commission to the contrary is proven by the fact that they have subsequently made special schedules covering some of the extra terminal services above mentioned. It was practically conceded at the trial that the rates fixed by the Commission would be reasonable if they did not preclude the carriers from collecting for these extra terminal services."

An examination of the following cases by the Interstate Commission, and court decisions, discloses well reasoned and uniform support of the conclusions reached by Judge Perry. *Associated Jobbers v. A., T. & S. F. Ry. Co.,* 18 Interst. Com. Com'n R. 310, affirmed by the Supreme Court

of the United States in 234 U. S. 294, 34 Sup. Ct. 814, 58 L. Ed. 1319; *Lanning-Harris Coal & Grain Co. v. A., T. & S. F. Ry. Co.,* 12 Interst. Com. Com'n R. 479; *A., T. & S. F. Ry. Co. v. I. C. C.,* (C. C.) 190 Fed. 591; *Southern Pacific Ry. Co. v. I. C. C.,* 219 U. S. 433, 31 Sup. Ct. 288, 55 L. Ed. 283; *Utica Traffic Bureau v. N. Y., O. & W. Ry. Co.,* 18 Interst. Com. Com'n R. 168; *Waverly Oil Works v. Penn. Ry.,* 28 Interst. Com. Com'n R. 621; *Dixie Cotton Oil Co. v. St. L., I. M. & S. R. Co.,* 27 Interst. Com. Com'n R. 295; *Swift & Co. v. C. & A. Ry. Co.,* 16 Interst. Com. Com'n R. 426; *Grand Junction N. & F. Co. v. D. & R. G. Ry. Co.,* 2 Colo. P. U. C. 181.

No case has been cited to the contrary and we know of none. The Public Utility Commission has the power to fix rates for service performed, or to be performed, but it has no power to fix a charge for a service not to be rendered. In the respect we are considering, it may deal with transportation service only, and its view of commercial policies and problems can have no greater legal force than the view of any other like number of persons. The injustice and unreasonableness of the rate complained of is well illustrated by the facts presented.

The Colorado & Southern Railway Company, The Chicago, Burlington & Quincy Railroad Company, and The Union Pacific Railroad Company are the only carriers transporting coal from the Northern field to Denver. We assume that each has tracks and spurs with industries located within the city on its own line. Necessarily but little of the coal carried by any one of the three lines may be expected to be transferred to the line of another of the three, and therefore to that extent no switching service is rendered.

The effect of this is to increase the transportation rate for a line haul from fifteen to twenty cents per ton over that found by the Commission and the court in the former proceeding to be just and reasonable upon every car of coal not legitimately subject to a switching charge.

The recognized rule as to the rights and obligations of

American railroads applied to line hauls and to the furnishing terminal facilities is clearly stated in *Associated Jobbers v. A., T. & S. F. Ry. Co.,* supra, as follows:

"The American railroad rate has always been recognized as covering the full service which the carrier gives, in furnishing the car, a proper place at which to load it, the conveyance of that loaded car, and its terminal delivery. * * * The rate, which it is required shall be published, is a complete rate, which includes not only the charge for hauling, but the charge for the use of the terminals at both ends of the line. The terminal charges referred to in section 6, and which must be expressly set forth in the carrier's tariff, are those for other services at the terminal which the carrier may furnish, such as storage, elevation, switching and cartage. This construction of the act is borne out fully by its history, and has been formally accepted by railroad counsel in advising the carriers. The railroads recognize their duty to make delivery under the flat rate stated in their tariffs, and such delivery is made upon industry tracks, which are part of the carrier's terminals, without additional charge. They treat a dependent spur as a part of their own depot, to which the published rate carries all freight. They have recognized the value of having industries located on their tracks and have competed, in proper and improper ways, to secure them as dependencies. They have, accordingly, given to such industries the same service that they give at their team tracks, treating the one as the substitute or equivalent of the other. If delivery is made at the team track the carrier must haul the car from the main line and place it on the team track. And so, if delivery is to be made at an industry, it must be conveyed from the main line to the industry. In the former, as in the latter case, there is an inter-terminal switching, and a placement of the car."

It was further said in that case:

"An additional charge may be made when an additional service is given. But the service here given is not additional to that for which the rate pays. If the shipper pays

for team-track delivery, and does not receive it, but asks instead, and is given, a side-track delivery, which costs the carrier no more, he may not be compelled to pay an additional charge upon the assumption that he has received a terminal team-track service which has not been given. A carrier may not so construct its rates as to compel an extra charge for like service, and this, in our judgment, the defendants at Los Angeles have done."

It is plain from the language of the order of the Commission in this case that its decision was influenced by considerations of commercial necessity rather than a determination of what are reasonable rates.

It was held in the case of *A., T. & S. F. Ry. Co. v. Interstate Commerce Commission*, (C. C.) 190 Fed. 591:

"The authority granted it under section 15 of the act to regulate commerce to prescribe reasonable rates when it shall be of the opinion that the rates fixed by the carrier are unreasonable does not confer absolute or arbitrary power to act on any considerations which the Commission may deem best for the public, the shipper and the carrier. Its order must be based on transportation considerations. While it may give weight to all factors bearing either on the cost or the value of the transportation services, it must disregard as well the demand of the shipper for protection from legitimate competition, domestic or foreign, for unlimited markets, or for the enforcement of equitable estoppels arising from a justifiable expectation that past rates will be maintained, as the demand of the carrier for the maximum rate under which the traffic will move freely."

A switching charge upon and over lines other than the line of the initiating carrier is a separate and distinct service and may be charged only when such service is rendered.

Counsel for respondents assert, with abundant authority to support the assertion, that it was undoubtedly within the power of the Commission to group the rates on coal from the Northern field and to make the same rate over the several roads from the several mines in that field to Denver, and then argue that if it is right to group the rates from

the mines in that field to Denver, it is also proper to blanket the rates in Denver.

The distinction is, that a rate from the mine to Denver is one fixed for a single service, though distances may vary somewhat as between the several mines of a group to a common destination; while the switching as between the different lines in the city is an additional and distinct service, for which a charge may properly be made only in case such service is actually rendered.

There is no dispute as to the facts in this case and the consideration here of the order of the Commission involves a conclusion of law to be drawn from the conceded facts.

The order of the Commission complained of is vacated and set aside, with direction to the Utilities Commission to ascertain and fix reasonable rates for each such separate service to be rendered.

The judgment is reversed.

*En banc.*

Bailey, J., dissents.

White, J., not participating.